RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 9 / 23 / 13

UNITED STATES DISTRICT COURT                                    b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

GILBERT ALVIN MCMILLIN, JR.,          CIVIL ACTION
        Appellant                     NO. 1:12-CV-03103

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER       JUDGE DEE D. DRELL
OF SOCIAL SECURITY,                   MAGISTRATE JUDGE JAMES D. KIRK
        Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Gilbert Alvin McMillin, Jr. ("McMillin") filed an application for social security disability insurance benefits ("DIB") on July 23, 2009, alleging a disability onset date of December 3, 2008 (Tr. p. 196) due to chronic lymphonic leukemia, seizures, and high blood pressure (Tr. p. 247). The Social Security Administration ("SSA") denied that application (Tr. p. 88).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on June 15, 2010 (Tr. p. 61), at which McMillin appeared with his attorney and a vocational expert ("VE"). The ALJ found that, although the 61-year-old McMillin has severe impairments of leukemia in remission, hypertension, and epilepsy (Tr. p. 94), he has the residual functional capacity to perform light work except for work requiring more than occasional decision-making or changes in the work setting, and he must take seizure precautions (Tr. p. 96). The ALJ concluded that McMillin cannot perform his past relevant work as a barge engineer, but he can work as an equipment cleaner, hand packager, or production worker, and therefore was not

disabled at any time through the date of the ALJ's decision on July 1, 2010 (Tr. pp. 97-98).

The Appeals Council vacated the ALJ's decision, finding the ALJ failed to assess McMillin's exertional limitations, the VE failed to specify whether McMillin can perform any semi-skilled work with transferable skills, and the ALJ erred in finding McMillin can perform light work with no transferable skills, since Medical-Vocational Rule 202.06 directed a finding of disabled (Tr. pp. 105). McMillin's case was remanded to the ALJ for further proceedings (Tr. p. 106). The Appeals Council ordered the ALJ (1) to further consider McMillin's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations, and (2) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on McMillin's occupational base, determine whether McMillin has acquired any skills that are transferable with very little, if any, vocational adjustment to other occupations under S.S.R. 82-41, use hypothetical questions that reflect the specific capacity/limitations established by the record as a whole, ask the VE to identify examples of appropriate jobs and state the incidence of such jobs, and identify and resolve any conflicts between the occupational evidence provided by the VE and information in the DOT and the SCO in accordance with S.S.R. 00-4p.

A second de novo hearing was held on May 4, 2011, at which McMillin appeared with his attorney, a medical expert, and a VE

(Tr. p. 27).  The ALJ found that, although the 62-year-old McMillin suffers from severe impairments of a seizure disorder and leukemia in remission (Tr. p. 16), he has the residual functional capacity to perform a full range of work at all exertional levels, but has nonexertional limitations of having to take seizure precautions and can only engage in low stress work with only occasional decision-making and changes in the work setting (Tr. p. 18).  The ALJ found that McMillin is unable to perform his past relevant work as a "stock-inventory clerk," but has transferable skills and can work as a file clerk, a parts clerk, or a tool crib attendant (Tr. pp. 20-21).  The ALJ concluded that McMillin was not under s disability as defined in the Social Security Act at any time through the date of the ALJ's decision on September 19, 2011 (Tr. p. 21).

McMillin requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

McMillin next filed this appeal for judicial review of the Commissioner's final decision.  McMillin raises the following issues on appeal (Doc. 10):

> 1. The final decision of the Commissioner does not comply with 20 C.F.R. § 404.1527, and good cause was not shown to reject the opinion of the claimant's treating specialist.
>
> 2. The ALJ intended to rely on Dr. Smith for the residual functional capacity finding, but Dr. Smith was not asked to offer an opinion as to the claimant's restrictions. As a result, no evidentiary choices exist which support the ALJ's finding that the claimant can perform work at all exertional levels, with occasional decision-making and work-setting changes, and seizure precautions.

3. McMillin's allegations of fatigue were improperly rejected without the assessment of credibility which is required by the regulations.

The Commissioner filed a brief in response to the appeal (Doc. 11), to which McMillin replied (Doc. 12).  McMillin's appeal is now before the court for disposition.

### Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.  42 U.S.C. 416(I), 423.  Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. 423 (d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. 423(d)(2).

### Summary of Pertinent Facts

McMillin was 61 years old at the time of his administrative hearing in 2010 and 62 years old at the time of his supplemental administrative hearing in 2011, has a college degree (Tr. p. 254), and has past relevant work as a controller/barge engineer (offshore) (1978-2008) (Tr. p. 248).

### 1. Medical Records

In 2007, McMillin was diagnosed with chronic lymphocytic

leukemia by Dr. Paul Zhang, an oncologist (Tr. pp. 379, 383).   In October 2007, Dr. Zhang noted the leukemia was low-grade (Stage 0), with a low IPI index, and did not require any intervention at that time; Dr. Zhang ordered that McMillin's blood be monitored every month (Tr. pp. 383-384).   In March 2008, Dr. Zhang noted McMillin's white blood cells were stable, stated that McMillin did not need chemotherapy at that time, and ordered him to have his blood tested every fourth months (Tr. p. 381).   In March 2009, Dr. Christine Ince, McMillin's new oncologist, noted that McMillin's leukemia was asymptomatic and his blood count was stable (Tr. p. 379).

In October 2007, McMillin was treated by his family physician, Dr. Bobby Ensminger, for hypertension (Tr. p. 411).   Dr. Ensminger noted that McMillin was taking Toprol-XL for hypertension, and Lexapro and Xanax for anxiety (Tr. p. 411).   Dr. Ensminger noted that McMillin's energy was good, he was not having any difficulties sleeping, and his oncologist had ordered monthly CBC's (Tr. p. 411).

On December 3, 2008, McMillin had a seizure at work (offshore), which left him confused, nonverbal, and uncooperative with the attempts to examine him fully; McMillin did not recall what happened (Tr. pp. 356-358).   The seizure involved a lack of awareness of surroundings and unresponsive staring for about one hour, then he became poorly responsive and combative with EMS, which lasted about five hours (Tr. p. 412).   McMillin was prescribed seizure medication including Valproic acid (Tr. p. 413). A CT scan of McMillin's chest showed a hepatic lesion in the  right

lobe of his lungs (Tr. pp. 369, 375), and an initial CT scan of
McMillin's brain was normal (Tr. pp. 370, 374).   Dr. Ensminger
referred McMIllin to a neurologist (Tr. p. 412).

In December 2008, Dr.  Michael E. Ehrlich, a neurologist,
performed an electroencephalogram on McMillin, which was abnormal,
suspicious for a disturbance in the left hemisphere of epileptic
potential (Tr. pp. 406-407).  Dr. Ehrlich noted that McMillin is an
engineer, married, graduated from college, lives with his wife, and
does not use alcohol, tobacco, or drugs (Tr. pp. 403-404).
McMillin reported that he suffers from weakness, blackouts, morning
stiffness, weight loss, insomnia, nervousness, depression, and
excessive thirst and urination (Tr. p. 403).  Dr. Ehrlich further
noted that, since McMillin was 21 years old, he has had spells of
unclear etiology for which he was prescribed Depakote.  McMillin
took Depakote for fifteen years, then stopped about a year
previously, after which he had two "spells"-in September 2007 and
in December 2007 (Tr. p. 402).  In December 2007, McMillin had a
"spell" at work; he told his boss he felt bad, then he sat down and
passed out, and did not remember being flown to a hospital, where
he was treated for a "psychiatric" problem with medication and
given a CT scan that was negative (Tr. p. 402).   During the
December 2007 spell, McMillin hyperventilated, and was nonverbal
and wouldn't follow the medical staff's commands when he arrived at
the hospital, but a short while later he was entirely back to
normal (Tr. p. 402).  Dr. Ehrlich told McMillin not to drive or
work until further notice, explained seizure precautions, and

6

ordered an MRI of the brain and another EEG (Tr. p. 405).

In January 2009, Dr. Ehrlich had McMillin undergo a 24-hour ambulatory EEG, with abnormal results (Tr. p. 400). An MRI of the brain was normal (Tr. p. 401). Dr. Ehrlich diagnosed epilepsy with left hemispheric sharp wave focus and prescribed Depakote, and told McMillin it was unsafe for him to return to work at the oil rig and that he was not to drive for six months (Tr. p. 397). Dr. Ehrlich also ordered McMillin to stop taking Lexapro, which he was taking for anxiety, depression and panic disorder (due to a position change at work), and to taper off his Xanax (Tr. p. 397).

Also in January 2009, Dr. Ensminger continued McMillin's seizure medication, prescribed Lunesta, and advised McMillin to avoid bathing unattended, driving, and cooking alone (Tr. pp. 413-414). In April June 2009, Dr. Ehrlich noted that McMillin had been seizure-free since December 2008 and continued the Depakote; McMillin was released to drive in June (Tr. pp. 395-396).

In June 2009, Dr. Ensminger examined McMillin for hypertension, epilepsy, and insomnia, and found McMillin weighed 173 pounds and his blood pressure was 106/68 (Tr. p. 417). In August 2009, Dr. Ensminger examined McMillin, noted he was 60 years old and weighed 186 pounds, his blood pressure was 116/72, and he suffered from seizures (Tr. pp. 419-420). McMillin reported that he was sleeping fine with Lunesta and his medications were continued (Tr. p. 420).

In September 2009, Dr. Hollis Rogers, an internist, reviewed McMillin's medical records, but did not examine McMillin. Dr.

Rogers found McMillin does not have any exertional, postural, or manipulative limitations, but should avoid concentrated exposure to hazards such as heavy machinery (Tr. pp. 431-435).

In October 2009, Dr. Bryan Bolwahnn, a medical psychologist, evaluated McMillin's mental status (Tr. p. 439).  Dr. Bolwahnn found the McMillin suffered from insomnia (Axis I), and epilepsy (Axis III), and had a GAF of 70 (Tr. pp. 439-441).[1]

In November 2009, Cheryl Marsiglia, Ph.D., reviewed McMillin's medical records (but did not examine McMillin) and filled out a Psychiatric Review Technique form, stating that McMillin suffers from insomnia and has a mild limitation in maintaining concentration, persistence or pace (Tr. pp. 444-456).

---

[1]     The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning.  Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").
        The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system.  The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR").  GAF is a standard measurement of an individual's overall functioning level.  The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year.  DSM-IV-TR at 32-34.  The GAF scale goes from 0-100: a score of 61-70 indicates some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships.  DSM-IV-TR, at 34.  Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

In September 2009, March 2010, and September 2010 Dr. Ince found McMillin's blood count was stable (Tr. pp. 469, 471, 504).

In December 2009, Dr. Ehrlich found McMillin's epilepsy was doing well on Depakote (Tr. p. 459), and found no other problems (Tr. p. 463).  In May 2010, Dr. Ehrlich again found McMillin's epilepsy was doing well, but noted his complaint of right arm numbness (Tr. p. 466).

Also in May 2010, Dr. Ensminger found no additional problems, and noted that Dr. Ingram had diagnosed bursitis/tendonitis in McMillin's right shoulder and given him a steroid injection (Tr. p. 479).  Dr. Ensminger filled out a "seizures residual functional capacity questionnaire" for McMillin (Tr. p. 474).  Dr. Ensminger noted the seizures were generalized, occurred without warning, and caused confusion, exhaustion, irritability, severe headache, and muscle strain which interfered greatly with McMillin's daily activities (Tr. p. 475).  Dr. Ensminger also wrote that McMillin's seizures were likely to disrupt the work of co-workers, that McMillin would need more supervision than an unimpaired worker, that he would need to take unscheduled breaks during an eight-hour day, although Dr. Ensminger was unable to say how often, that McMillin is unable to tolerate work stress, even in a low stress job, and that McMillin's impairments would cause "good days" and "bad days" (Tr. pp. 476-477).

In November 2010, McMillin reported to Dr. Ensminger that he gets very nervous in stressful situations and feels he may have another seizure, but has not yet (Tr. p. 521).

In March 2011, Dr. Ince noted that McMillin's complete blood count ("CBC") was again relatively stable, but he had mild osteoporosis (Tr. pp. 516, 518).

### 2. 2010 Administrative Hearing

At his June 2010 administrative hearing, McMillin testified that he was 61 years old, 5'9" tall, and weighed 190 pounds, having gained about ten pounds in the last two years (Tr. p. 65). McMillin testified that he has a driver's license, but does not drive very much (Tr. p. 65).

McMillin testified that he sees Dr. Ensminger and Dr. Ehrlich for high blood pressure, sleeplessness, and seizures, for which he takes Depakote, Toprol, and Lunesta (Tr. p. 66).    McMillin testified that he does not have any side effects with those medications (Tr. p. 66). McMillin testified he also sees Dr. Ince for check ups for leukemia (Tr. p. 66). McMillin testified that, in May 2010, his complete blood count was too high (Tr. pp. 66-67). McMillin also testified that he is a little cold due to his leukemia (tr. p. 67).

McMillin testified that his last seizure was in December 2008; his medication is preventing the seizures (Tr. p. 67). McMillin testified that he does not have any warning that a seizure is about to occur, and that tiredness and stress tend to bring on a seizure (Tr. p. 74). As a result of his seizures, McMillin is scared of hurting others, so he drives very little (a short distance about once a week) (Tr. p. 75). McMillin testified that, when he comes out of a seizure, he does not know where he is, how he got there,

or what he needs to do, sometimes he does not recognize people, and he is physically weak for a couple of days afterward (Tr. p. 75).

McMillin testified that he had numbness in his right hand, for which he was given a steroid injection (Tr. p. 68). McMillin testified he still has some tingling and numbness in his right hand, but he does not have problems grasping and holding things (Tr. p. 68). McMillin testified that his hand has not hurt since he had the steroid shot (Tr. p. 68).

McMillin testified that he is able to dress and bathe himself without assistance, he takes out the garbage and deals with the yard, and his wife takes care of dishes and the laundry (Tr. p. 69). McMillin testified that he usually gets up around 7:00 a.m., eats a light breakfast, his two daughters check on them, his granddaughters visit them in the morning, he eats a light lunch, and then he rests in the afternoon (Tr. pp. 69-70). McMillin testified that he eats supper, then either reads or watches TV; McMillin testified that he does not do very much outside during the hot weather (Tr. p. 70). McMillin testified that he lies down between a few minutes and an hour every day; if he does something, he needs to rest more (Tr. p. 76). McMillin testified that he considers watching TV to be resting (Tr. p. 76). McMillin testified he may be tired during the day because of poor sleep the night before; he usually wakes up a couple of times during the night (Tr. p. 76).

McMillin testified that he attended the University of Louisiana in Monroe and earned a degree in Agriculture Business

(Tr. p. 70).  McMillin testified that he has difficulty writing comprehensibly now, and that he has trouble with basic math now (Tr. p. 70).

McMillin testified that he receives long-term disability benefits and retirement benefits; he retired in October 2009 (Tr. pp. 70-71).  McMillin testified that his disability onset date, December 3, 2008, is the last day he worked (Tr. p. 71).

McMillin testified that, as a barge controller/engineer, he usually got up at 5:00 a.m., helped with the morning report, helped unload supplies from any boats that came in the night before, oversaw unloading and storing supplies and deck cargo (which included doing any necessary pressurization of holding tanks), would blow out unloaded tanks to clean them, and figured out the bearable load on the jack-up in order to arrange everything on the rig to balance it and, if necessary, either take water on or pump water out to keep the rig level (Tr. pp. 72-73).

McMillin also testified that he can walk about a quarter of a mile, lift up to about fifty pounds or seventy-five once, becomes sore and stiff if he sits in one place for a long period of time, can sit for about thirty minutes before he has to get up and move around, and can stand for up to thirty minutes before he has to sit (Tr. pp. 73-74).

McMillin testified that stress used to cause him to have a seizure, but his stress level is better since he stopped working (Tr. pp. 76-77).  McMillin also testified that he has trouble with his memory, concentration, focus, and attention span, which make it

12

difficult to read very long (Tr. p. 77).  McMillin testified that he can sit and concentrate on something for about fifteen minutes (Tr. p. 77).  McMillin can do yard work if he takes breaks every fifteen to twenty minutes (Tr. p. 78).  McMillin testified that he would still be working if he could (Tr. p. 78).

The VE testified that McMillin's past relevant work as a barge engineer was medium level work with an SVP of 8, which is skilled work (Tr. p. 79).  The VE testified that McMillin has skills which are transferable to light work, but not to sedentary work; the skills for a barge engineer, as set forth in the <u>Selective Characteristics of Occupations</u> defined in the <u>Revised Dictionary of Occupational Titles</u> (<u>SCO</u> No. 05.06.02 (stationary engineering), <u>DOT</u> No. 197-130-010 (engineer-water transportation) are directing the work of others, coordination of eyes, hands and fingers to run or adjust a system, reading a handle board meter, dials, and gauges, using math skills to interpret readings, and remaining calm during emergencies (Tr. pp. 79-80).[2]

---

[2] The <u>Revised Dictionary of Occupational Titles</u> states in pertinent part:

"197.130-010 ENGINEER (water trans.) alternate titles: marine engineer; mechanic, marine engine

"Supervises and coordinates activities of crew engaged in operating and maintaining propulsion engines and other engines, boilers, deck machinery, and electrical, refrigeration, and sanitary equipment aboard ship: Inspects engines and other equipment and orders crew to repair or replace defective parts. Starts engines to propel ship and regulates engines and power transmission to control speed of ship. Stands engine-room watch during specified periods, observing that required water levels are maintained in boilers, condensers, and evaporators, load on generators is within acceptable limits, and oil and grease cups are kept full. Repairs machinery, using hand tools and

The ALJ posed a hypothetical involving a person of McMillin's age, education, and work experience, who can do light work, can only do low stress work, can only occasionally make decisions or have changes in his work setting, and has to observe seizure precautions (no working at heights, no working on scaffolds, no working around dangerous equipment, etc.) (Tr. pp. 80-81).  The VE testified that such a person could not do McMillin's past relevant work as a barge engineer, but could do light work such as equipment or vehicle cleaner (light, unskilled, 71,000 jobs nationally), hand packager (unskilled, light, 318,000 jobs nationally), and production worker (unskilled, light, 222,000 jobs nationally) (Tr. pp. 81-82).

The ALJ posed a second hypothetical that was the same as the first, except that instead of light work, the person can do only sedentary work (Tr. p. 82).  The VE testified that such a person could work as a stock handler (unskilled, sedentary, 47000 jobs nationally), hand packager (unskilled, sedentary, 22,000 jobs nationally), or production worker (unskilled, sedentary, 28,000 jobs nationally) (Tr. p. 82).

The ALJ posed a third hypothetical involving the same person as in the second hypothetical, with the added limitation that he cannot work eight hours a day regularly and consistently (Tr. p.

---

power tools. Maintains engineering log and bell book (orders for changes in speed and direction of ship). May be required to hold appropriate U.S. Coast Guard license, depending upon tonnage of ship, type of engines, and means of transmitting power to propeller shaft. ...GOE: 05.06.02 STRENGTH: M GED: R4 M3 L3 SVP: 8 DLU: 77."

83).  The VE testified there are no jobs that such a person can perform.

When questioned by McMillin, the VE testified there were no work skills that would transfer to sedentary work, but there were work skills that would transfer to light work (Tr. p. 83). However, the VE further testified there are no light jobs that McMillin's work skills will transfer to, given the limitations in the first hypothetical, due to the restrictions of only occasional changes in the work setting, only occasional decision making, and seizure precautions (Tr. pp. 84-85).

### 3. May 4, 2011 Administrative Hearing

McMillin appeared at his second administrative hearing, in May 2011, with his attorney, a medical expert, and a VE (Tr. p. 27).

The medical expert ("ME"), Dr. (no first name given) Smith, a surgeon, testified that McMillin's chronic lymphocytic leukemia does not require treatment; he has a persistently elevated white blood count which indicates leukemia activity, but is stable and without any of the other stigmata of leukemia (Tr. pp. 31, 35). The ME also testified that McMillin's grand mal seizure disorder, which is established by the EEG studies, is controlled with Depakote and McMillin is able to do activities such as driving (Tr. p. 32).  The ME further noted that Lunesta seems to help McMillin's insomnia (Tr. p. 32).

The ME testified that it is still necessary for McMillin to observe seizure precautions (no working at heights, no going up and down ladders and scaffolds, etc.), but that he does not have any

15

other limitations due to his medical problems (Tr. p. 33).  The ME
further testified that he does not believe McMillin meets or equals
a listing.  The ME testified that leukemia could cause McMillin's
fatigue (Tr. p. 35).

McMillin testified that he was 62 years old, 5'8" tall, 175
pounds, left-handed, and drives (Tr. p. 36).  McMillin further
testified that he sees his oncologist every six months, has his
blood tested every three months, and takes Depakote, Lunesta, and
calcium/D3 (because Depakote causes bone loss) (Tr. p. 36).
McMillin testified he does not have any medication side effects
other than needing to take the Depakote with food or milk (Tr. p.
37).

McMillin testified that his last grand mal seizure was in 2008
and he had not had any petit mal seizures that he knew of (Tr. p.
37).  McMillin testified that his leukemia causes fatigue (Tr. pp.
37, 43-44).  McMillin also testified that he takes medication,
Toprol, to control his blood pressure but that sometimes his
pressure is as high as 140/85 (Tr. p. 38).

McMillin testified that he is able to do household chores (Tr.
p. 38).  McMillin testified that, on a typical day, he gets up
between 6:00 and 7:00, eats breakfast, and then does whatever his
wife wants to do (Tr. p. 39).

McMillin testified that he has a Bachelor's degree in
Agriculture Business, has income from retirement and long term
disability, and last worked in December 2008, when he had a grand
mal seizure while working offshore (Tr. p. 39).  McMillin testified

16

that his employer did not want him to return to work after that
seizure (Tr. p. 40). McMillin testified that, as a
controller/barge engineer, he checked to make sure the supplies
came in correctly, helped with repairs, and made sure the
appropriate staff were on hand for repairs; it was a managerial
position (Tr. p. 40).

McMillin testified that he can walk about thirty minutes
before he has to stop and take a break, lift up to about 75 pounds
once, and sit about thirty minutes before he has to get up (Tr. p.
41). McMillin testified that his job included physical work along
with the men, and that he did not have an "office, clerical,
administrative" type job (Tr. p. 42).

McMillin testified that his neurologist told him that stress
from changes in his work, stress from his job duties (such as
having to get up and work in the middle of the night), and sleep
deprivation might cause of his seizures, so his doctor advised him
to stop working (Tr. pp. 42-43).

McMillin testified that he does not know whether he could work
on his feet five or six hours out of eight a day now; standing a
lot makes his legs and back hurt (Tr. p. 44). McMillin testified
that he takes breaks throughout the day, to sit or lie down (Tr. p.
45).

McMillin testified that he actually worked on drilling rigs
instead of barges, and that he was responsible for taking care of
anything on the rig other than the drilling operation (Tr. p. 47).
McMillin testified that he ordered small supplies to keep the rig

17

running, made repairs, checked the safety equipment (fire extinguishers, life jackets, boats, escape capsules, etc.) and repaired it or ordered new equipment, and physically offloaded, checked, and stored supplies (Tr. pp. 47-50). McMillin testified that the heaviest weight he lifted was 100 pounds, but usually less (Tr. p. 49).

The VE, Ms. (no first name given) Clem, testified that McMillin was actually a stock clerk or inventory clerk, rather than a barge engineer (Tr. p. 50).[3] VE Clem testified that McMillin's past relevant work as a stock clerk was light, skilled work, SVP 5, DOT 219.387-030, which occasionally involved heavy work (Tr. p. 50). VE Clem testified that McMillin's transferrable skills are maintaining records, keeping inventory, having to be accurate, and decision-making (Tr. p. 51).

In response to a hypothetical from the ALJ, involving a person of McMillin's age, education, and work experience, who has no exertional limitations but must use seizure precautions and can only perform low stress jobs (i.e., only occasional decision making and only occasional changes in the work setting), VE Clem testified that such an individual would not be able to perform McMillin's past relevant work. VE Clem further testified that such a person could work as a file clerk (light, semi-skilled, SVP 3, DOT 206.387-034, Census code 526, 195,835 jobs in nationally and 3035

---

[3] Ms. Clem's unspecified professional qualifications are not part of the administrative record before the court, and there is no "Clem" (or any phonetically similar name) in the online database for vocational rehabilitation counselors licensed in the state of Louisiana.

jobs in Louisiana), a parts clerk (light, semi-skilled, SVP 3, DOT 222.367-042, Census code 562, 425,725 jobs nationally and 5600 jobs in Louisiana), or a tool crib attendant (medium skilled, SVP 5, DOT 222.367-062, Census code 562, 127,720 jobs nationally, 1675 jobs in Louisiana) (Tr. p. 52).

The ALJ posed a second hypothetical which added a limitation of an inability to do sustained work activity for a full eight-hour day on a regular and consistent basis (Tr. pp. 52-53). VE Clem testified there were no jobs such a person could perform (Tr. p. 53).

VE Clem further testified that almost all of the jobs of file clerk are in a completely different industry from McMillin's past relevant work (Tr. p. 55), and that the work settings for the file clerk jobs would be significantly different from the work setting in McMillin's past relevant work (Tr. p. 55). VE Clem testified that three-fourths of the part clerk jobs are in a significantly different industry from McMillin's past relevant work, and that three-fourths of the part clerk jobs would not be in the oil industry (Tr. pp. 55-56). VE Clem testified that most of the tool crib attendant jobs are related to the oil industry, but are not offshore jobs (Tr. p. 56). VE Clem testified that the tool crib attendant job would be on land, in a warehouse, in the vicinity of heavy moving machinery such as forklifts, although he would not be operating it (Tr. pp. 57-58).

## ALJ's Findings

To determine disability, the ALJ applied the sequential

19

process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether McMillin (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that McMillin has not engaged in substantial gainful activity since December 3, 2008 (Tr. p. 16), and that he has severe impairments of a seizure disorder and leukemia in remission (Tr. p. 16). The ALJ also found that McMillin is unable to perform his past relevant work (Tr. p. 20).

At Step No. 5 of the sequential process, the ALJ further found

20

that McMillin has the residual functional capacity to perform the full range of work except as reduced by his nonexertional limitations of requiring seizure precautions (no work around dangerous equipment, heights, stairs, ladders and scaffolds), and low stress work with only occasional decision making and changes in the work setting (Tr. p. 18).   The ALJ found that the claimant is of advanced age with at least a high school education and transferable work skills (Tr. p. 20).  The ALJ concluded that there are a significant number of jobs in the national economy which McMillin can perform, such as file clerk, parts clerk and tool crib attendant and, therefore, McMillin was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on September 19, 2011.

### Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which

support the Commissioner's decision, but must include a scrutiny of the record as a whole.   The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981).   Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).   The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125.   But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."   <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 1 - Opinion of Treating Specialist</u>

McMillin contends the final decision of the Commissioner does not comply with 20 C.F.R. § 404.1527, and good cause was not shown to reject the opinion of the claimant's treating specialist, Dr. Ensminger.

Pursuant to 20 C.F.R. § 404.1527(d), an examining physician's

opinion should be given more weight than a non-examining physician's opinion.[4] Also, <u>Carry v. Heckler</u>, 750 F.2d 479, 484 (5th Cir. 1985).  Little weight is accorded to the opinion of a reviewing physician if it is contrary to the opinion of the only physician to examine the patient.  <u>Strickland v. Harris</u>, 615 F.2d at 1109-10 (5th Cir. 1980).  However, the weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings.  <u>Elzy v. Railroad Retirement Board</u>, 782 F.2d 1223, 1225 (5th Cir. 1986);  <u>Jones v. Heckler</u>, 702 F.2d 616, 621 (5th Cir. 1983).  An acceptable medical opinion as to disability must contain more than a mere conclusory statement that the claimant is disabled.  It must be supported by clinical or laboratory findings.  <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1084 (5th Cir. 1981).

In <u>Myers v. Apfel</u>, 238 F.3d 617, 621 (5th Cir. 2001), the Fifth Circuit stated it has long held that ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability. However, the opinion of the treating physician is not conclusive

---

[4] Section 404.1527(d) and 416.927(d) of 20 C.F.R. state: *(d) How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
*(1) Examining relationship.* Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

and the ALJ must decide the claimant's status.  Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the treating physician's testimony.  The good cause exceptions recognized by the Fifth Circuit include disregarding statements that are brief, conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence.  An ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. Myers, 238 F.3d at 621, citing Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000).  The Regulations require the ALJ to perform a detailed analysis of a treating physician's views under the criteria set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) only in the absence of controverting medical evidence from other treating and/or examining physicians.  Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000).

Dr. Ensminger is McMillin's long-term family doctor who is familiar with all aspects of McMillin's health problems and the reports of his specialists.  Dr. Ensminger stated that McMillin's seizures are likely to disrupt the work of co-workers, that McMillin needs more supervision than an unimpaired worker, and that he needs to take unscheduled breaks during an eight-hour day, though Dr. Ensminger was unable to say how often (Tr. p. 476).  Dr. Ensminger also stated that McMillin is unable to tolerate work

stress, even in a low stress job, and that McMillin's impairments would cause "good days" and "bad days" (Tr. p. 477).

The ALJ stated in his opinion (Tr. pp. 19-20), "A state agency consultant opined that the claimant could perform work at all exertional levels with seizure precautions.  A state agency psychological consultant noted the claimant did not have a severe mental impairment.  Dr. Smith testified that the claimant's limitations on heights should remain in effect.  In sum, the above residual functional capacity assessment is supported by the objective medical evidence including the testimony of the medical expert."  The two state agency consultants and Dr. Smith were all non-examining, non-treating doctors.

Normally, an ALJ errs in adopting the opinions of the non-examining medical consultants over that of a longtime treating physician.  In this case, the non-examining physicians agreed with the treating doctor as to McMillin observing seizure precautions. McMillin's neurologist, Dr. Ehrlich, only told McMillin that it was unsafe for him to work offshore, to observe seizure precautions, and not drive for six months.  There is no evidence in the administrative record that a treating doctor told McMillin he cannot work at all.  However, in May 2010, Dr. Ensminger filled out the "seizure residual functional capacity questionnaire" in 2010 and stated that McMillin was unable to work.

Since the objective medical evidence does not support Dr. Ensminger's statement that McMillin cannot engage in any work, the ALJ did not err in finding that McMillin can do low-stress work.

McMillin argues that, under <u>Newton v. Apfel</u>, supra, the ALJ erred in failing to adopt Dr. Ensminger's opinion, which was uncontroverted by any treating or examining physician.  While it is true that Dr. Ensminger's statement that McMillin cannot work is uncontroverted, it is also unsupported by McMillin's treating neurologist, Dr. Ehrlich.  Dr. Ehrlich only told McMillin to observe seizure precautions, not work offshore and not drive for six months, the implication being that he could work as long as he did those things.  Although Dr. Ensminger appears to have stated McMillin cannot work because work stress may cause a seizure, Dr. Ehrlich never concluded that stress caused the seizures and did not prohibit McMillin from working altogether.  Therefore, medical evidence of record does not support Dr. Ensminger's assessment that McMillin cannot work at all.

This ground for relief is meritless.

<u>Issue 2 - Residual Functional Capacity</u>

Next, McMillin contends the ALJ intended to rely on Dr. Smith for the residual functional capacity finding, but Dr. Smith was not asked to offer an opinion as to the claimant's restrictions. McMillin argues there is no evidence to support the ALJ's finding that the claimant can perform work at all exertional levels with seizure precautions, and only occasional decision-making and work setting changes.

Although the ALJ did not ask Dr. Smith about McMillin's limitations on his residual functional capacity, Dr. Smith discussed limitations (Tr. p. 33).  Dr. Smith stated that McMillin

must observe seizure precautions, such as not being around dangerous or unprotected machinery, working at heights, or going up and down ladders and scaffolds (Tr. p. 33).  Dr. Smith further stated that McMillin did not have any other limitations due to his medical problems (Tr. p. 33).  However, Dr. Smith did not specify McMillin's maximum exertional capacity, such as what he can lift and carry; the only evidence of what McMillin can lift and carry was from McMillin.  McMillin testified that he thinks he can lift 75 pounds once, and maybe he can lift 100 pounds once.

Although the ALJ found that McMillin can perform work at all exertional levels, there is no evidence that McMillin is capable of performing heavy and very heavy work.  Heavy work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds."  20 C.F.R. 404.1567(d).  Very heavy work "involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more."  20 C.F.R. 404.1567(e).  McMillin's testimony indicates he is not sure whether he can do heavy work, and that he cannot do very heavy work.

Moreover, 20 C.F.R. § 204.00 states that, where the claimant's maximum sustained work capability is limited to heavy or very heavy work (or can work at all exertional levels), the individual ordinarily will not have a severe impairment or will be able to do his past work-either of which provide a basis for a decision of "not disabled," and an impairment which does not preclude heavy work or very heavy work would not ordinarily be the primary reason

27

for unemployment and generally is sufficient for a finding of not disabled.  However, in the case at bar, the ALJ found, contrarily, that McMillin cannot do his past relevant work *and* has severe impairments, *but* can do work at *all* exertional levels.  The ALJ's finding does not accord with 20 C.F.R. § 204.00.

Therefore, substantial evidence does not support the ALJ's finding that McMillin can perform work at all exertional levels, since the evidence of record does not indicate that McMillin can perform heavy and very heavy work.

Since McMillin's maximum exertional level is unclear, McMillin's case should be remanded to the Commissioner for further proceedings.

Issue 3 - Credibility

Finally, McMillin contends his allegations of fatigue were improperly rejected by the ALJ without the assessment of the credibility which is required by the regulations.

Although a claimant's assertion of pain or other symptoms must be considered by the ALJ, 42 U.S.C. § 423(d)(5)(A) requires that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged. Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989), citing Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1985).

A claimant's symptoms will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the

28

objective medical evidence.  20 C.F.R. §404.1529(c)(4).  Subjective complaints must be corroborated by objective medical evidence. Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2000).

The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. Elzy v. Railroad Retirement Bd., 782 F.2d 1223, 1225 (5th Cir. 1986); Loya v. Heckler, 707 F.2d 211, 215 (5th Cir. 1983).  The ALJ's decision on the severity of pain is entitled to considerable judicial deference.  James v. Bowen, 793 F.2d 702, 706 (5th Cir. 1986); Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987).  Such a credibility determination is within the province of the ALJ. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 128-29 (5th Cir. 1991).  Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints.  Falco v. Shalala, 27 F.3d 162, 163-64 (5th Cir. 1994).

The ALJ made the following findings as to McMillin's pain and credibility (Tr. p. 19):

> "The undersigned finds that the claimant's subjective
> complaints are not fully credible considering (1) the
> claimant's own description of his activities and life
> style; (2) the degree of medical treatment required; (3)
> discrepancies between the claimant's assertions and
> information contained in the documentary reports; (4) the
> claimant's demeanor at the hearing; (5) the reports of
> the treating and examining practitioners; (6) the medical
> history; and (7) the findings made on examination.  In
> summary, the undersigned considered the factors described
> in 20 C.F.R. 404.1529 and 416.929(c)(3) and Social
> Security Ruling 96/7p and concludes that the claimant's

allegations of disabling symptoms and limitations are not fully supported by the evidence presented at hearing, and that the residual functional capacity finding in this case is justified.   The undersigned has considered the claimant's activities of daily living.   The claimant testified that he was able to tend to his own personal needs.   He testified that he performs household chores. In addition, he testified that he could lift 75 pounds. The undersigned further notes that the claimant's leukemia is in remission and he has not had a seizure since 2008."

First, the ALJ's finding that McMillin's leukemia is in remission is incorrect.  McMillin's oncologists never stated that he is in remission.  Dr. Ince's medical records for September 25, 2009 and March 25, 2010 state that McMillin has "leukemia NOS **w/o** remission" and "leukemia-chronic lymphocytic-stage 0" (Tr. pp. 469, 471).  Apparently, the ALJ relied on notes by Dr. Ensminger that McMillin has "chronic lymphoid leukemia, in remission" (Tr. pp. 415, 521).  However, Dr. Ensminger also referred to it, at other times, as "chronic lymphoid leukemia" (Tr. p. 474).  Since Dr. Ensminger does not treat McMillin's, the discrepancy in his notes appears to be nothing more than imprecise record-keeping on his part and it carries no weight with the undersigned.  There is no medical evidence that McMillin's leukemia is in remission.

McMillin's elevated blood count has remained constant but stable since his disease was discovered.  According to the medical records, McMillin has a chronic lymphocytic leukemia which has not advanced beyond Stage 0 and has never been symptomatic beyond causing persistently elevated white blood cell counts (Tr. pp. 31, 34-35).  Since McMillin's leukemia has always been in Stage 0, it is being monitored rather than treated (Tr. p. 31).   See

30

MEDLINEplus Health Information, Medical Encyclopedia: "Chronic Lymphocytic Leukemia*,"* *available at* http://www.nlm.nih.gov/medlineplus/chroniclymphocyticleukemia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health). Also, Mayo Clinic: Chroniclymphocytic leukemia, available at http://www.mayoclinic.com/health/chronic-lymphocytic-leukemia/DS00565. Therefore, McMillin's medical records show that his Stage 0 leukemia is active and chronic, and not in remission.

Next, it is well-established that fatigue can be a symptom of chronic lymphocytic leukemia. See MEDLINEplus Health Information, Medical Encyclopedia: "Chronic Lymphocytic Leukemia*," available at* http://www.nlm.nih.gov/medlineplus/chroniclymphocyticleukemia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health). Therefore, there is an objective medical basis for McMillin's complaints of fatigue. McMillin's consistent complaints of fatigue are well-documented in his medical records. It is noted that Dr. Smith, the medical expert who testified at the hearing and conceded that "perhaps" McMillin's leukemia causes fatigue (Tr. p. 35), is a general surgeon and not an oncologist.

Finally, the ALJ noted that McMillin does household chores, tends to his own personal needs, and can lift 75 pounds (Tr. p. 19). However, McMillin also testified that he takes rest breaks as necessary during the day.

Since the ALJ erred in finding that McMillin's leukemia is in

remission and that finding clearly affected the ALJ's findings, and there is an objective medical basis for McMillin's complaints of fatigue, the ALJ's basis for his credibility choices concerning claimant's complaints is invalid.  Since the ALJ's credibility choices are unreasonable, his finding that McMillin's  can perform work is not supported by substantial evidence.  <u>Carry v. Heckler</u>, 750 F.2d 479, 485-86 (5th Cir. 1985).  Substantial evidence does not support the Commissioner's conclusion that McMillin can perform work.

Since it is unclear whether McMillin can perform any work, given his true impairments, McMillin's case should be remanded to the Commissioner for further proceedings.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that McMillin's case be REMANDED to the Commissioner for further proceedings, to properly evaluate McMillin's credibility, residual functional capacity, and ability to work.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be

considered by the district judge before he makes a final ruling.

A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN **fourteen(14)** BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of September 2013.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE